Adam B. Wolfson (*pro hac vice* forthcoming)
William R. Sears (*pro hac vice* forthcoming)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
adamwolfson@quinnemanuel.com
willsears@quinnemanuel.com

Stephen Wood (USB #12403)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
2755 E. Cottonwood Parkway, Suite 520
Salt Lake City, Utah 84121
(801) 515-7300
stephenwood@quinnemanuel.com

Andrew Faisman (*pro hac vice* forthcoming)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
295 5th Avenue, 9th Floor
New York, New York 10016
(212) 849-7000
andrewfaisman@quinnemanuel.com

*Attorneys for Plaintiff MarketDial, Inc.*

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| MARKETDIAL, INC.,<br><br>   *Plaintiff*,<br><br>     v.<br><br>APPLIED PREDICTIVE TECHNOLOGIES,<br>INC. and MASTERCARD INCORPORATED,<br><br>   *Defendants*. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY DEMANDED** |

Plaintiff MarketDial, Inc. ("MarketDial") brings this Complaint for damages and equitable relief against Defendants Applied Predictive Technologies, Inc. ("APT") and Mastercard Incorporated ("Mastercard") for violations of Section 2 of the Sherman Act (15 U.S.C. § 2), wrongful use of civil proceedings, abuse of process, and tortious interference with economic relations.

## INTRODUCTION

1.      Businesses often conduct experiments, or "A/B testing," to test new products, package designs, store layouts, and other initiatives. For decades, Defendant APT's product, Test & Learn ("T&L"), has dominated the market for software that enables A/B testing for physical business locations. Plaintiff MarketDial, a startup founded in 2016 and based in Salt Lake City, sought to introduce competition in that market and became the first (and still only) competitive threat to APT because its software is more affordable, more intuitive, and accessible to a wider range of organizations. Instead of competing with MarketDial on the merits, however, APT sought to drive MarketDial out of the market through anticompetitive and unfair means.

2.      But APT did not, and does not, act alone. Defendant Mastercard, a payment-processing giant, acquired APT in 2015 for $600 million. Since then, APT has been almost entirely subsumed by Mastercard, to the point that APT has no independent employee base or online presence separate from Mastercard. Mastercard has sought to maximize its investment by directing and supporting the anticompetitive scheme against MarketDial.

3.      Together, APT and Mastercard have (1) pursued a years-long campaign of sham litigation against MarketDial and (2) further hamstrung MarketDial's ability to compete by bundling and tying APT software with Mastercard's credit card services.

4.      The sham litigation against MarketDial was an action in this District, *Applied Predictive Technologies, Inc. v. MarketDial, Inc.*, Case No. 2:19-cv-00496-JNP-CMR (D. Utah).

The litigation was brought by APT, acting with oversight and support from Mastercard. The Court overseeing the litigation already found that APT's claims were objectively specious—that is, while it was not apparent (except to APT and Mastercard) that they were objectively baseless at the start, they proved to be so over time. The Court also found that APT subjectively brought its claims in bad faith for the anticompetitive purpose of putting MarketDial out of business. Indeed, the litigation was so baseless that the Court not only dismissed APT's claims at summary judgment, but also ordered APT to pay MarketDial's attorneys' fees.

5.    APT first sued MarketDial in June 2018. APT's core allegation was that MarketDial had stolen unspecified trade secrets from APT. In reality, APT and Mastercard knew APT's purported trade secrets did not merely fall short of being protectible—they did not exist at all.

6.    Nonetheless, for years, APT concealed the baseless nature of its litigation against MarketDial, falsely claiming MarketDial had stolen purported trade secrets while refusing to disclose what those purported trade secrets were. Whenever MarketDial pressed APT to specify its purported trade secrets, APT ducked and dodged. MarketDial was forced to compel additional discovery, and APT provided supplemental discovery numerous times. But each round of supplemental discovery still failed to identify any trade secrets. Instead, APT produced voluminous materials and vaguely suggested that they somehow encompassed some unspecified trade secrets. This was a wild goose chase: on numerous occasions MarketDial was forced to pore over hundreds or thousands of pages of materials in search of supposed "trade secrets."

7.    The truth was that APT's purported trade secrets were fictitious, and the litigation was a ploy to mislead and misdirect MarketDial while draining its finances and hamstringing its ability to cultivate customer relationships, generate investment capital, and grow its business. This was obvious all along to APT and Mastercard, but not to MarketDial or the Court. It took years of

hard-fought litigation, including multiple motions to dismiss and contentious discovery battles, to reveal that APT's purported trade secrets had never existed to begin with.

8.     Confirming as much, the Court granted MarketDial's motion for summary judgment in August 2024, holding that APT had failed to identify any trade secrets. ECF No. 689 ("MSJ Order") at 20.[1] The Court recognized that APT's strategy was to obscure the baseless nature of its litigation, while improperly extending and complicating the lawsuit. It explained that APT's submission of voluminous discovery materials that supposedly contained trade secrets served "to treat the court or a finder of fact like a pig, hunting for truffles buried in briefs." *Id.* at 22 (citation modified). Even in its opposition to summary judgment, APT continued to tease the possibility that it would identify trade secrets in the future.

9.     In March 2025, the Court sanctioned APT for its bad-faith conduct and awarded MarketDial $2.8 million in attorneys' fees. ECF No. 708 ("Sanction Order"). The Court found that APT had gone to great lengths to deliberately conceal the baseless nature of the litigation. The Court explained that "***even though the [trade secrets] claim superficially appeared to have merit from the outset, it ultimately lacked any evidentiary support***." *Id.* at 8 (emphasis added). The Court also recognized that "it became clear that APT could not define a single trade secret, because none existed" only "***after intensive discovery***." *Id.* at 4 (emphasis added). And the Court recognized that "APT's consistent failure to define *any* trade secret or provide *any* evidence supporting its claims, coupled with its voluminous filings, gives rise to the reasonable inference that ***APT knew it had no claim at all and sought to distract the court and the opposing party with profuse documentary records.***" *Id.* at 5-6 (emphasis added). As a result, APT's "trade secret

---

[1]     Unless otherwise specified, this Complaint's citations to docket entries refer to the docket of *Applied Predictive Technologies, Inc. v. MarketDial, Inc.*, Case No. 2:19-cv-00496-JNP-CMR (D. Utah).

misappropriation claims were (1) objectively specious and (2) subjectively made in bad faith." *Id.* at 7. This conduct was especially pernicious because "[a] specious claim" like APT's "may even sound logical or convincing, but it is ultimately hollow and lacks substantiation." *Id.*

10.     The Court also recognized the anticompetitive nature of APT's sham litigation against MarketDial, explaining that "APT's actions also give rise to a reasonable inference that ***this litigation was undertaken for the purpose of putting an upstart competitor out of business.***" *Id.* at 6 (emphasis added). The Court based this conclusion, among other things, on "the fact that ***MarketDial was APT's only real competitor and threat to its monopoly over the market***." *Id.* at 7 (emphasis added).

11.     APT and Mastercard have amplified the effect of their sham litigation against MarketDial by using it to disparage MarketDial and its services. Parroting their own sham litigation, APT and Mastercard have claimed throughout the marketplace that MarketDial's products were misappropriated, that MarketDial is in legal jeopardy, and that MarketDial may not stay in business in the face of their sustained litigation assault. APT and Mastercard have also used the sham litigation to intimidate prospective MarketDial customers. In the sham litigation, APT pointed to its customers' data feeds, which send data to APT, as a source of purported APT trade secrets. These allegations were baseless, including because the data feeds belong *to the customers*, and they have been rejected by the Court. But APT and Mastercard conveyed to prospective MarketDial customers that they might get dragged into a legal battle with APT and Mastercard if they shared their data feeds with MarketDial. APT and Mastercard's misleading statements and intimidation tactics have steered customers toward APT's dominant product by creating unfounded concerns about switching to MarketDial.

12.     Mastercard further entrenches APT's monopoly by anticompetitively bundling in a way that effectively provides APT's products to customers at a steep discount, and often for free. Mastercard provides a commonly used credit card that many merchants have little choice but to accept. It thus has market power in the market for general purpose credit card services, which serves the same merchants that also occupy the market for offline A/B testing software. As a federal court has recently recognized, Mastercard charges merchants inflated fees and reaps supracompetitive profits in that market.

13.     Under arrangements that Mastercard imposes on merchants that use its credit card services, many merchants receive Mastercard credit that they may only spend on a limited range of Mastercard-affiliated services—including APT's product, T&L. This credit expires unless used, meaning merchants who receive it have a strong incentive to spend it quickly on eligible services such as T&L.

14.     This operates as an anticompetitive bundling and *de facto* tying scheme that coerces customers into purchasing APT's software. By allowing merchants to purchase T&L using Mastercard credit, Mastercard provides a discount that far exceeds the incremental cost of producing T&L, and effectively makes T&L free to many merchants. This is confirmed by statements from many prospective customers who report that, although they would prefer to use MarketDial's software, they can obtain T&L "for free" and therefore cannot justify selecting MarketDial as their provider. Thus, even though MarketDial's software is of higher quality and (absent anticompetitive discounts) is priced more competitively than APT's software, Mastercard uses its market power in the market for general credit card services to prevent competition on the merits between APT and MarketDial (or any other would-be competitor) in the market for offline A/B testing software.

15. MarketDial has thus far managed to survive the anticompetitive assault by APT and Mastercard—but just barely. MarketDial has spent most of its time in the market defending against sham litigation that, while meritless, has scared away customers, dried up its fundraising, and stifled its growth to the point that it cannot meaningfully compete against APT. MarketDial has also had to contend with Mastercard using its market power in the market for general purpose credit card services to further entrench APT's monopoly through its anticompetitive bundling and *de facto* tying scheme. As a result of Defendants' anticompetitive acts, MarketDial has grown far less than it otherwise would have, and lost hundreds of millions of dollars in value as a result. It now seeks redress through this lawsuit.

## THE PARTIES

16. Plaintiff MarketDial is a technology startup based in Salt Lake City, and a corporation organized and existing under the laws of the State of Delaware. It was founded in 2016 by Morgan Davis and John Stoddard. MarketDial creates innovative software that enables companies to conduct A/B testing for physical business locations.

17. Defendant APT is a corporation organized and existing under the laws of the State of Delaware. APT was founded in 1999. Throughout APT's history, with the exception of MarketDial, APT has been the only provider of software that enables companies to perform offline A/B testing. APT maintains a monopoly over that market and has pursued anticompetitive actions against MarketDial.

18. Defendant Mastercard is a corporation organized and existing under the laws of the State of Delaware. Mastercard acquired APT in 2015. Mastercard has pursued anticompetitive actions against MarketDial, and has also directed and supported all the anticompetitive actions by APT that are described herein.

## JURISDICTION AND VENUE

19.     MarketDial brings federal causes of action under the Sherman Act and causes of action under Utah law. The causes of action under Utah law are related to the federal claims such that they form part of the same case or controversy under Article III of the United States Constitution. This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1337, and 1367.

20.     This Court has personal jurisdiction over APT and Mastercard. Their anticompetitive acts have been targeted at MarketDial, which is located in this District. They have committed the wrongful acts described herein throughout the country, including in this District. Those wrongful acts include, but are not limited to, pursuing meritless litigation against MarketDial in this District.

21.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and because of the Defendants' conduct in and contacts with this District.

## FACTUAL ALLEGATIONS

**I.      APT'S MONOPOLY POWER**

**A.      The Relevant Market Is Software to Conduct A/B Testing for Physical Business Locations in the United States**

22.     As explained below, as a result of anticompetitive conduct by APT and Mastercard, APT dominates the market for software that enables A/B testing for physical business locations in the United States. That is the relevant market for this lawsuit.

23.     Businesses often run experiments in which two approaches are tested in a controlled fashion in order to identify the effects of a particular initiative. This methodology, commonly known as A/B testing, is an established process for testing new products, package designs, store

layouts, and many other business initiatives. Software in the relevant market is used to conduct A/B testing for offline business initiatives—that is, initiatives for brick-and-mortar business locations—as well as to understand insights derived from A/B testing.

24.    Customers in the relevant market consist of merchants, such as retail and restaurant chains. These types of businesses employ tens of millions of Americans and survive on razor-thin margins. They rely on A/B testing software to optimize new initiatives, reduce risk, and gain insights about their customers.

25.    As an example, a fast-food restaurant chain can use software in the relevant market to conduct A/B tests that determine whether introducing a particular new burger will increase its profits. The software can assist in identifying test stores in which the new burger should be introduced, identifying control stores in which it should not be introduced, comparing behavior across those locations, and understanding whether the new burger will be profitable.

26.    Offline A/B testing presents unique statistical challenges. In the above example, stores in which the new burger is tested must be behaviorally and physically representative of all the stores in the restaurant chain. They cannot, for example, be skewed toward rural communities or high-income neighborhoods. Meanwhile, control stores must be statistically comparable to test stores. Behavior must be compared between test stores and control stores in a manner that isolates the impact of the new burger while accounting for any irrelevant factors that might affect the results, such as differences in weather. Software that enables companies to perform offline A/B testing assists in overcoming these types of statistical challenges, while reducing the cost and technical difficulty of A/B testing.

27.    For this reason, there are no reasonably interchangeable substitutes for offline A/B testing software. For example, methodologies for A/B testing that are not software-based cannot

address the statistical challenges of offline A/B testing at a level of efficiency or scale that is comparable to software solutions. Likewise, *online* A/B testing software is not a reasonably interchangeable substitute since it is specifically tailored for experimenting with different versions of websites or other internet services, and is not designed to conduct experiments across brick-and-mortar stores or to account for real-world differences such as geography or weather.

28.     Because of the unique benefits offline A/B testing software offers, and its low substitutability with other products, a hypothetical monopolist of offline A/B testing software—or an actual monopolist, like APT—could potentially implement a small but substantial, non-transitory increase in price ("SSNIP") because businesses using offline A/B testing software would not switch to other types of products in sufficient numbers to make this increase unprofitable. This is borne out by the fact that APT, an actual monopolist, has been able to profitably charge supracompetitive prices for its product in the United States, and has profitably raised prices in the exact way contemplated by the SSNIP test.

29.     APT and MarketDial are the only meaningful participants in the market for offline A/B testing software, with APT being the dominant player. The Court overseeing the litigation previously recognized this dynamic, describing APT as having a "monopoly over the market," and MarketDial as an "upstart competitor" and "APT's only real competitor." Sanction Order at 6-7.

30.     The relevant geographic market is the United States. Merchants in need of offline A/B testing software look to the United States for competitive options. APT and MarketDial are both based in the United States, and no other companies offer comparable software. Because software for offline A/B testing is provided digitally, organizations using such software have no preferences as to where companies that supply this software are geographically located within the United States. Once software for offline A/B testing is available to a customer, it can be used to

conduct experiments for locations anywhere. The two participants in the market, APT and MarketDial, compete in the United States, although that competition has been severely restricted by the conduct described herein.

31.     Notably, even if the geographic market were defined more broadly, APT and MarketDial are still the only competitors, and APT still has monopoly power. There are no other firms that provide similar services internationally. Confirming as much, foreign customers have purchased services from APT and MarketDial, and MarketDial competes with APT for foreign clients. Defendants' anticompetitive actions, while based in the United States, thus harmed competition and MarketDial by making it more difficult for MarketDial to attract foreign clients as well as domestic clients.

**B.     APT Has Monopoly Power In the Relevant Market**

32.     APT was founded in 1999. For many years, APT was the only provider of software that enables companies to perform offline A/B testing. APT's incumbent product, T&L, is costly, highly technical, and time-consuming to implement. T&L is thus primarily usable by large organizations that employ in-house data scientists. It is generally not suitable for smaller organizations that do not employ data scientists.

33.     As the Court has already found, APT has a "monopoly over the market." Sanction Order at 7. The Court has also found that "[p]rior to MarketDial's creation, APT had no meaningful market competitors." *Id.* at 4. Indeed, APT has itself admitted that it has lacked competitors other than MarketDial. *See* MSJ Order at 2.

34.     APT was and continues to be massively profitable as a result of its monopoly status. As a reflection of its profitability, it was acquired by Mastercard in 2015 for $600 million.

## II.      MARKETDIAL EMERGES AS APT'S ONLY COMPETITOR

35.      MarketDial was founded by Morgan Davis and John Stoddard. Before founding MarketDial, they both worked at leading management consulting firms—Davis at The Boston Consulting Group ("BCG") and Stoddard at McKinsey & Co. ("McKinsey"). Davis and Stoddard recognized the importance of A/B testing for business optimization because of their experience in management consulting. For example, Davis's work required him to manually perform business analyses, including A/B tests, which gave him the idea of creating software that automates the design and analysis of business experimentation. Davis only heard of APT after having independently conceived of that idea. Stoddard and Davis also conducted independent industry research, including by consulting with experts in business and academia. They recognized that APT was a monopolist with a subpar product, and saw an opportunity to introduce competition in the market.

36.      Davis and Stoddard founded MarketDial in 2016 in Salt Lake City. They both remain at the company. Davis is MarketDial's CEO and Stoddard is its Chief Revenue Officer.

37.      MarketDial had initial success in attracting early interest from investors. It raised over $2 million over the first two years of its existence, 2016 and 2017. It raised an additional $6 million in 2018.

38.      MarketDial spent over $20 million over its first several years on developing its product. This enabled MarketDial to create A/B testing software that far surpasses APT's legacy T&L product. Unlike T&L, MarketDial's software is intuitive and readily accessible to merchants that do not employ data scientists and have limited data sophistication. MarketDial's functionality also allows greater experimentation with fewer stores. For example, it allows for a single test store to be matched to a single control store, whereas T&L requires a single test store to be matched

with multiple control stores and thus can occupy an entire fleet of stores with only a small number of experiments. At the same time, MarketDial's software empowers large merchants to do A/B testing at scale, with hundreds of experiments ongoing at any given time. MarketDial also offers its software at a lower price point than APT.

39.     As noted, APT and MarketDial are the only two players in the market. As a result, MarketDial competes for business only against APT. It has never won a customer from, or lost a customer to, any other company. Customers have also reported to MarketDial that they view the market as a two-player market. Likewise, APT has admitted that MarketDial is the only company in the world that offers competing software.

40.     In 2017, after spending a year and over $500,000 in capital, MarketDial's efforts began to pay off and it obtained its first customer, which switched from APT. In 2018, MarketDial won a second customer from APT. APT has identified Tailored Brands, La-Z-Boy, Maverik, Meijer, The Container Store, Woolworths Group Limited, Army & Air Force Exchange Service, Dick's Sporting Goods, Eyemart Exchange, Keurig Dr. Pepper, Learning Care Group, and the Mattress Firm as APT customers lost to MarketDial. ECF No. 460 at 1.

41.     In addition to winning customers from APT, MarketDial forced APT to reduce prices. APT has identified Coles Group Limited, Family Dollar-Dollar Tree, DSW, GameStop, Office Depot, and J. Crew as APT customers given price reductions due to MarketDial. ECF No. 460 at 1. For some customers, the price reductions APT granted in light of competition from MarketDial were over one third of the original price.

42.     As of June 2022, APT disclosed a total of 66 customers for whom it claimed lost profits. ECF No. 423 at 2. This reflects a combination of customers MarketDial won from APT and customers for whom APT lowered prices due to competition from MarketDial.

43.     Although this is exactly how competition is supposed to work, APT and Mastercard considered this outcome—lost customers, lower prices, and a viable and growing direct competitor—unacceptable. So they set in motion a plan to drive MarketDial out of business.

## III.     ANTICOMPETITIVE CONDUCT

### A.     Sham Litigation

#### i.     APT Brings Baseless Litigation Against MarketDial

44.     APT and Mastercard sought to bring a lawsuit against MarketDial to divert its resources and focus from growing its business, and to provide cover for them to bad-mouth MarketDial to customers. But they needed a hook.

45.     They eventually learned that for about five months in 2015, Stoddard was part of a team at McKinsey tasked with evaluating dozens of software offerings to determine their potential value to McKinsey clients. APT had sought to have McKinsey recommend APT's T&L product to McKinsey's clients, and as part of that effort APT shared documents that provide background about the basics of what T&L does. Stoddard reviewed some of those documents, which were essentially marketing materials and contained only high-level information about APT's business. For example, one of those documents is a "Standard Deployment Guide," a seven-page document providing a simple overview of how T&L is installed. The Court has observed that, contrary to APT's arguments, this document is not a trade secret and "does not provide a sufficient evidentiary basis for the fact-finder to conclude that a trade secret existed." MSJ Order at 25.

46.     As noted, Stoddard and Davis founded MarketDial through their own efforts, including by developing original software. They did not use any APT trade secrets in doing so. But that did not matter to APT.

47.     In June 2018, a month and a half after APT lost a second customer to MarketDial, APT sued MarketDial and Stoddard in the District of Delaware. APT's central allegation was that

MarketDial and Stoddard had engaged in "a systematic effort to acquire valuable confidential and trade secret information from APT and improperly use it for their own advantage." ECF No. 1 at ¶ 2. APT falsely alleged that, by accessing its marketing-style documents while working at McKinsey, "Stoddard duped APT into providing its confidential information and trade secrets." *Id.* ¶ 5. In reality, "there was simply no evidence to support that Defendants had access to APT's trade secrets, much less misappropriated them." Sanction Order at 4.

48.    Although APT was the plaintiff in this lawsuit, the litigation was orchestrated by Mastercard. APT has been almost entirely subsumed by Mastercard: APT has no in-house lawyers of its own, and the in-house lawyers responsible for APT's litigation against MarketDial work directly for Mastercard.

49.    APT and Mastercard knew their allegations were baseless from the beginning of the litigation, but MarketDial didn't. "A specious claim" like APT's "may even sound logical or convincing." *Id.* at 7. And APT's trade secrets claims "superficially appeared to have merit from the outset" of the litigation. *Id.* at 8. APT's pleadings did not identify what its purported trade secrets were—it simply alleged in generalized terms that MarketDial had misappropriated them. As a result, MarketDial was unable to fully evaluate APT's allegations, much less determine they were baseless and brought in bad faith. It took years, countless motions, and millions of dollars in litigation fees for the truth to emerge.

50.    The action transferred to the District of Utah in July 2019 on a motion by MarketDial and Stoddard. ECF No. 64 at 2. In transferring the case, the Court noted that Delaware's sole connection to the action was that it is the legal domicile of APT and MarketDial. *Id.*

51.    APT's first complaint also included a claim of patent infringement. After extensive motion practice, APT filed a second amended complaint in August 2019, in which it added an unfair competition claim. ECF No. 102. The Court dismissed all claims other than the trade secrets claims in November 2020. ECF No. 129. It dismissed APT's patent infringement claim because the patent at issue "is directed to an abstract concept and no 'inventive concept' transforms it into an eligible application." *Id.* at 39.[2] The Court also dismissed APT's unfair competition claim because "APT conceded that patent infringement was the sole basis" for that theory, and the patent claim failed as a matter of law. *Id.* at 50.

52.    Undeterred, APT filed a third amended complaint in July 2021. ECF No. 188. There, APT realleged its trade secrets claims, added claims for breach of contract and various torts, and added Davis as a defendant. In April 2022, the Court dismissed APT's contract claims because APT had failed to identify a single contract between APT and MarketDial or its founders, and because APT was not a third-party beneficiary of any relevant contract. ECF No. 315 at 12, 17. The Court similarly dismissed APT's tort claims, including because they were preempted by APT's trade secrets claims. *Id.* at 23, 28, 33.

53.    All the claims brought by APT, as well as the lawsuit considered as a whole, were objectively baseless and subjectively brought in bad faith. Only APT's trade secrets claims survived the pleading stage, and the sham litigation dragged on for years with those being the only claims remaining. The inexistence of APT's purported trade secrets was not fatal at the pleading

---

[2]    In November 2024, APT, Mastercard, MarketDial, Stoddard, and Davis reached a settlement regarding their patent disputes. *See* ECF No. 700. In light of the settlement, MarketDial dropped a separate lawsuit it had brought against APT, in which an APT patent had been found to be ineligible subject matter. *MarketDial, Inc. v. Applied Predictive Technologies, Inc.*, Case No. 2:23-cv-00477-JNP-JCB (D. Utah), ECF No. 53. The trade secret disputes continued and were unaffected by the settlement. The settlement also does not affect MarketDial's claims here.

stage because APT's pleadings had to be accepted as true, and APT falsely alleged in its pleadings it had trade secrets and that MarketDial misappropriated them.

### ii. APT Forces Protracted Litigation While Concealing the Baseless Nature of the Litigation

54.     As the litigation proceeded to discovery on the remaining trade secrets claims, APT went to ever greater lengths to obfuscate the baseless nature of its allegations. Whenever MarketDial pressed APT to specify what its purported trade secrets were during discovery, APT bobbed and weaved. APT's goal was to hide the inexistence of its purported trade secrets, and thereby delay the ability of MarketDial and the Court to understand the sham nature of the litigation.

55.     Obtaining discovery from APT was like pulling teeth. After years of obstructionism by APT, MarketDial brought a motion to compel discovery in August 2021. ECF No. 198. There, MarketDial pointed out that "APT must prove the existence of a trade secret" but "[i]n response to requests to identify and explain its trade secrets and efforts to maintain secrecy, APT has stonewalled." *Id.* at 2. APT's interrogatory responses had provided only "generalized descriptions of documents allegedly containing trade secret information, without any substantive explanation of what information in those documents is supposedly protected by law." *Id.* MarketDial explained, for example, that "1,000+ pages of documents APT insists contain trade secret information include mundane items that cannot possibly constitute trade secrets, such as dozens of Outlook meeting invites, identities of publicly-disclosed clients, and a published Harvard Business Review article." *Id.* As a result, "[w]ith less than five months left in fact discovery, MarketDial underst[ood] little more about the alleged trade secrets than at the start of the case." *Id.* at 3.

56.     On October 6, 2021, Magistrate Judge Cecilia M. Romero ordered the parties to meet and confer "to discuss the parameters of permissible objections to the requested discovery

and whether Plaintiff's [production] was adequate" under the law. ECF No. 215. Judge Romero instructed the parties to discuss "(1) whether Plaintiff has identified with reasonable particularity how the disputed discovery, as it relates to the trade secret, is outside the general knowledge and not readily ascertainable by proper means such that it warrants trade secret protection; and (2) if more than just reference to documents has been produced to sufficiently identify the trade secret as it is inadequate to cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information." *Id.*

57.    Following the motion to compel, APT provided supplemental responses on October 18, 2021 and produced over 800 MB of documents on October 20, 2021. ECF No. 219 at 1. On November 18, 2021, Judge Romero also ordered APT to produce more documents in response to some of MarketDial's discovery requests. ECF No. 238.

58.    Although APT's stonewalling persisted throughout discovery, MarketDial obtained discovery from APT bit by bit, with APT making at least 45 productions throughout the litigation. But each round of supplemental discovery still failed to identify any trade secrets. Instead, APT produced voluminous materials and repeatedly suggested that they somehow encompassed unspecified trade secrets. This was a wild goose chase: on numerous occasions MarketDial was forced to pore over hundreds or thousands of pages of materials in search of trade secrets, only to discover, again and again, that APT had still failed to identify any trade secrets at all, much less any that MarketDial had stolen.

59.    For example, MarketDial's first interrogatory asked APT to "identify and describe, with specificity, each and every one of the alleged trade secrets that Plaintiff alleges or contends Defendants misappropriated or misused." MSJ Order at 6-7. APT provided six ever-changing responses to this interrogatory, including several rounds of supplementation in 2021 and 2022,

culminating in a 70-page response. As the Court observed, APT's response to this and related interrogatories "reveal[ed] only cursory, high-level descriptions of *categories* or *sources* of information allegedly comprising each trade secret, without much more." *Id.* at 20; *see also id.* at 7 (summarizing APT's responses to first interrogatory).

60.     As another example, MarketDial's sixth interrogatory asked APT to "identify and explain all facts and sources of information that support, refute, or otherwise relate to any contention that Plaintiff's trade secret derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person." *Id.* at 20. As the Court found, APT responded by claiming in general terms that "APT's trade secrets have tremendous economic value from not being generally known and from not being readily ascertainable," but without addressing any trade secrets in particular. *Id.* at 20-21.

61.     "Other materials produced by APT [were] hardly more specific." *Id.* at 21. They also "[did] not meaningfully identify *what* in each trade secret ought to be picked out of the compilation as generally known or readily ascertainable," nor "reveal *how* each compilation trade secret derives value from not being generally known, taken as a whole." *Id.*

62.     APT's efforts to conjure trade secrets became increasingly circular. "[T]o make up for the lack of a defined trade secret, APT added post-hoc rationales, including that its trade secrets were 'metacompilations' of other alleged trade secrets, clearly generated for the primary purpose for this litigation." Sanction Order at 5. In addition, "APT offered interrogatory responses that only referenced volumes of other interrogatory responses which then only generally described categories of information that were claimed to be misappropriated." *Id.*

63.     "By keeping its alleged trade secrets undefined and ambiguous, APT was able to continue with the litigation, incurring expenses that it could afford as a bigger, more established

company." *Id.* at 5. APT's goal of driving up litigation costs was the reason that, as the Court has observed, discovery was "intensive" and the case was generally "heavily litigated, as evidenced by the docket entries exceeding 700." *Id.* at 2, 4.

64.     As just one example of APT driving up litigation costs, APT put up a frivolous fight to maintain an "Attorneys Eyes Only" designation under the operative Protective Order, instead of a "Confidential" designation, for an early version of its response to MarketDial's first interrogatory. The effect of the baseless "Attorneys Eyes Only" designation was to prevent MarketDial, Davis, and Stoddard from reviewing the interrogatory response—which in turn helped obscure what purported trade secrets APT was claiming had been misappropriated. Recognizing both the meritless nature of the designation and its prejudice to MarketDial, Judge Romero denied APT's request in May 2021. ECF No. 159. She explained that the interrogatory response consisted of "references to various alleged trade secrets and generalized descriptions of alleged trade secrets as opposed to actual trade secret information," and that preventing MarketDial, Davis, and Stoddard from seeing the interrogatory response "would significantly impair their ability to defend against [APT's] claims." *Id.* at 2-4. APT then raised a baseless objection to Judge Romero's Order, leading to yet another round of unnecessary briefing. The order was affirmed by the District Court in July 2021. ECF No. 181.

65.     As another example of APT's abusive litigation tactics, it provided untimely identification of fourteen additional fact witnesses who purportedly had information about its alleged damages, all its own employees, on February 14, 2023—*eight months* after fact discovery closed on June 8, 2022, and when expert discovery was essentially complete. In January 2024, Judge Romero excluded APT from calling those witnesses on a motion by MarketDial, Stoddard, and Davis. ECF No. 612. She noted that it was "difficult for the court to understand [APT's]

argument that the [disclosures] are not untimely." *Id.* at 5. Judge Romero also acknowledged that APT's untimely disclosures were prejudicial to MarketDial, Stoddard, and Davis. *Id.* at 7. Predictably, APT raised a baseless objection to this Order as well. ECF No. 625. That objection was mooted by the Court's summary judgment decision.

66.     Eventually, and only "after intensive discovery, it became clear that APT could not define a single trade secret, because none existed." Sanction Order at 4. But, even then, APT continued the litigation for anticompetitive purposes. "Rather than dismissing the claims or litigating the case in a professional manner, APT doubled down on its assertions, submitting copious records and flooding the docket with motions." *Id.* As before, "[t]his caused [MarketDial's] attorneys to put more time into the litigation than a typical intellectual property dispute would require." *Id.*

67.     Each of the improper tactics APT employed—obstructionism, evasion, delay, and driving up litigation costs—was a feature, not a bug. APT's sham litigation, along with its concealment of the fact that its purported trade secrets did not exist, were calculated to suppress competition from MarketDial. APT even used the litigation to fish for confirmation that its bad-faith tactics were working. For example, when conducting a deposition of Davis, APT used much of its limited time to ask about MarketDial's cash reserves and attempt to learn how long it would take for MarketDial to run out of cash.

### iii.    The Court Dismisses APT's Sham Litigation

68.     In August 2024, after six years of litigation, the Court granted summary judgment to MarketDial. The Court recognized that APT's various discovery responses had been cursory and failed to identify any trade secrets, as described above. MSJ Order at 20-21. In its opposition to summary judgment, instead of identifying the purported trade secrets at issue, APT had provided "at times, paragraph-long string cites lacking explanatory parentheticals or any identifiable

21

structure." *Id.* at 20. Overall, APT "fail[ed] to disclose" any of the alleged "trade secrets or their value with sufficient clarity such that the court or a jury could meaningfully identify the secrets or render a verdict on APT's behalf without relying on mere conjecture." *Id.* at 19.

69.     The Court also recognized that APT did more than simply fail to adduce evidence in support of its trade secret claims—instead, it actively concealed that it never had anything resembling a single actionable trade secret. The Court described APT's litigation strategy as "tantamount to 'sleight-of-hand' in a failed effort to stave off summary judgment." *Id.* at 21. It explained that "[s]ummary judgment was [APT's] chance to put its cards on the table and make an argument, rather than simply string-cite exhibits and insist from the mosaic of exhibits a trade secret might emerge at trial." *Id.* at 23.

70.     Worse still, APT had continued to tease the possibility that it would identify trade secrets in the future, even while opposing summary judgment. As the Court explained, "APT seems to suggest throughout its opposition memorandum that it will show its hand down the line— that once speaking to the jury, it will divulge its secrets." *Id.* at 22 n. 9.

71.     The Court explained that APT's submission of discovery materials that supposedly contained trade secrets served "to treat the court or a finder of fact like a pig, hunting for truffles buried in briefs." *Id.* at 22 (citation modified). By the time the summary judgment motion was decided, APT had been putting MarketDial through such truffle-hunting exercises for years through its misleading, vexatious, and circular responses to discovery requests that sought to understand what APT's purported trade secrets were. As a result, MarketDial could not have reasonably determined APT's claims were baseless until discovery ended and the litigation proceeded to the summary judgment stage.

72.     On January 28, 2026, the Federal Circuit upheld summary judgment in MarketDial's favor on the ground that "APT failed to sufficiently identify and define its alleged trade secrets under the statutory definition." *Applied Predictive Techs., Inc. v. Marketdial, Inc.*, No. 2024-1751, 2026 WL 218291, at *2 (Fed. Cir. Jan. 28, 2026). The Federal Circuit confirmed that "APT's response to [MarketDial's] interrogatories provided cursory, high-level descriptions of different categories or sources of information without more," APT "failed to provide sufficient definition for a fact-finder to discern whether [APT's alleged trade secrets] derive independent economic value from not being generally known or readily ascertainable," and "the materials and testimony cited in APT's opposition memorandum did not sufficiently identify and define the alleged trade secrets to meet the statutory definition." *Id.*

### iv.     The Court Sanctions APT

73.     In March 2025, the Court granted MarketDial over $2.8 million in attorneys' fees in light of APT's bad faith and its efforts to conceal the sham nature of its allegations. The Court concluded that APT's trade secret claims were "objectively specious" and "subjectively made in bad faith." Sanction Order at 7. It noted that "[a] specious claim may even sound logical or convincing, but it is ultimately hollow and lacks substantiation." *Id.*

74.     The Court recognized that APT had gone to great lengths to deliberately conceal the baseless and sham nature of the litigation. The Court explained that "***even though the claim superficially appeared to have merit from the outset, it ultimately lacked any evidentiary support***." *Id.* at 8 (emphasis added). Only "***after intensive discovery, it became clear that APT could not define a single trade secret, because none existed***." *Id.* at 4 (emphasis added). The Court also recognized that "APT's consistent failure to define *any* trade secret or provide *any* evidence supporting its claims, coupled with its voluminous filings, gives rise to the reasonable inference that ***APT knew it had no claim at all and sought to distract the court and the opposing***

*party with profuse documentary records.*" *Id.* at 5-6 (emphasis added). Moreover, APT "did not take any steps to withdraw its trade secret claims when it became apparent that it had no evidence to support them" and, instead, "sought to aggressively litigate every issue, flooding the docket with motions and documents of so-called 'evidence' that amounted to nothing." *Id.* at 9.

75.     The Court found that "APT's actions also give rise to a reasonable inference that *this litigation was undertaken for the purpose of putting an upstart competitor out of business*." *Id.* at 6-7 (emphasis added). In support of this "conclusion," the Court cited "APT's knowledge of MarketDial's financial runway after targeted questioning in depositions, the intensity in which it litigated the case, the lack of support for its misappropriation claim, and the fact that MarketDial was APT's only real competitor and threat to its monopoly over the market." *Id.* at 7. Likewise, the Court observed that it was "apparent" that the aggressive manner in which APT approached this litigation was calculated to "*put an upstart competitor out of business because no other motive could explain the amount of [] time and money it invested in litigating a fruitless claim.*" *Id.* at 9-10 (emphasis added).

**v.     Capitalizing On Sham Litigation To Spread Fear, Uncertainty, and Doubt**

76.     The damage done by APT's sham litigation has extended beyond the lawsuit itself. APT and Mastercard have ensured APT's sham litigation against MarketDial torpedoed its growth by using the litigation to disparage MarketDial and its services to merchants, investors, and others in the industry. Parroting their own baseless allegations, they falsely claimed that MarketDial's products were misappropriated and that MarketDial is in legal jeopardy. They have also pointed to MarketDial's precarious financial position and sought to cast doubt on MarketDial's ability to stay in business—a situation they created with their sham litigation. In particular, APT and

Mastercard repeatedly told merchants that MarketDial's products were misappropriated and that MarketDial may be forced to cease operations.

77.    For example, APT and Mastercard have disparaged MarketDial when making sales pitches to prospective customers—most of whom are also potential MarketDial customers. At one point during the litigation, their standard sales presentation included a slide that discussed the sham litigation and falsely suggested that MarketDial had stolen APT's trade secrets and thus was not trustworthy. APT and Mastercard's sales presentations have also included false representations about MarketDial's legal jeopardy and supposed precarious financial position, both of which were based on the sham litigation.

78.    These misleading statements steered (and continue to steer) customers toward APT's own dominant products by creating unfounded concerns about the quality of MarketDial's product and MarketDial's continued viability in the market. Courts routinely recognize that such misleading statements constitute exclusionary conduct, especially when considered in concert with a broader pattern of anticompetitive conduct.

79.    Likewise, APT and Mastercard's disparagement of MarketDial has also had an effect on many potential investors, who have hesitated to fund MarketDial while the sham litigation was ongoing. Multiple potential acquirers of MarketDial have backed off as well, citing the sham litigation.

80.    Further building on the sham litigation, APT and Mastercard have also intimidated customers that were considering switching from APT to MarketDial by falsely claiming that customers could not share *their own* data feeds to APT with MarketDial. A data feed is a way for a business to share relevant data, such as data about sales transactions, with another organization. Information sent through a data feed is formatted as a large table of rows and columns. It is often

necessary for customers to provide data feeds to MarketDial in order for MarketDial's A/B testing product to work. As a convenience to customers switching from APT, MarketDial was willing to accept data feeds in the same format that the customers had previously used when sending data to APT. This creates more work for MarketDial, which must restructure the data to fit MarketDial's needs, but MarketDial offered to do it for customers that preferred to continue structuring the data that way.

81.    APT and Mastercard tried to use this against MarketDial, by claiming that the *customers'* data feeds were actually *APT's* trade secrets. As the Court ultimately recognized, APT was unable to show that any aspect of the data feed is an APT trade secret. MSJ Order at 35-36. But APT and Mastercard nonetheless reached out to customers and, pointing to the sham litigation, claimed that customers sharing *their own* data feeds with MarketDial could violate *APT's* trade secrets. Even though this claim, like APT's other trade-secrets allegations, ultimately proved baseless, it succeeded in intimidating customers who could not afford even the threat of getting dragged into a legal battle involving APT and Mastercard.

## B.    Additional Anticompetitive Conduct by Mastercard

82.    Mastercard has backstopped the anticompetitive effects of the sham litigation by deploying its market power in the market for general credit card services to harm competition in the market for A/B testing services.

### i.    The Market for General Purpose Credit Card Transactions

83.    Mastercard is one of the largest financial services companies in the world. In addition to monopolizing the market for offline A/B testing software through its ownership of APT, Mastercard operates in other markets in which MarketDial does not compete. In particular, Mastercard is one of the most popular networks providing credit card transaction services in the

United States. The largest banks in the United States issue Mastercard-branded credit cards, which operate through the Mastercard network.

84.    Mastercard thus operates in the market for general purpose credit card transactions. The Supreme Court has recognized this as a relevant market for antitrust purposes, describing it as a "two-sided transaction platform" market. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 544-45 (2018). Specifically, the two sides of the market are merchants who purchase card acceptance services and consumers, or cardholders, who purchase payment card services. Credit card networks such as Mastercard facilitate credit card transactions between merchants and cardholders. The merchants who participate in this market are the same merchants who are potential customers in the market for offline A/B testing software.

85.    Credit cards have unique features that make them attractive to consumers. For credit cards without a revolving balance, consumers benefit from an interest-free loan until the end of the month when the balance has to be paid. Consumers may also maintain a revolving balance on their credit cards, and are typically required to pay interest on that balance. Many credit cards offer rewards to consumers, thereby encouraging loyalty to a particular card. Cardholders are also entitled to legal protections that are unique to credit cards.

86.    Credit cards are also widespread and easy to use. Notably, the use of credit cards is not limited to physical cards. Cardholders also use cards virtually, such as through digital wallets and the ability to make online transactions using card number, expiration date, and a three-digit code.

87.    In light of their unique features, credit cards are distinct from other forms of payment. For example, they are often more convenient than cash. They are also unlike debit cards in that they do not immediately debit an existing asset account.

### ii.    Mastercard Has Market Power Over the Market for General Purpose Credit Card Transactions

88.    Mastercard has possessed market power in the market for general purpose credit card transactions since the 1970s, and its market power has increased significantly over the years. By the 1990s, Mastercard credit cards became the primary or only credit cards for tens of millions of consumers in the United States, many of whom favor Mastercard credit cards because of rewards points and other incentives. As a result, most merchants have little choice but to accept Mastercard credit cards.

89.    Mastercard's market power in the market for general purpose credit card transactions is a central issue in antitrust litigation that Mastercard has been fending off for decades, in which merchants and other plaintiffs allege that it has engaged in anticompetitive conduct. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65 (E.D.N.Y. 2024)*. Mastercard brought a motion for summary judgment in which it argued, among other things, that there was insufficient evidence of its market power. The court overseeing that litigation recently rejected that motion, finding that "a jury could reasonably conclude that Mastercard has market power." *Id.* at 98.

90.    In reaching that conclusion, the court also noted that "Mastercard has consistently had approximately 25% market share by transaction volume" in the market for general purpose credit and charge card services, which is "a market defined by high barriers to entry." *Id.* at 99. "The credit-card transaction market is highly concentrated and has had no new entrants in nearly forty years." *Id.* Moreover, "Mastercard has the ability to price discriminate" and "Mastercard executives have admitted that they do not consider costs when setting prices." *Id.* The court also found that "Mastercard has enjoyed consistently high profit margins," and noted evidence of Mastercard profit margins ranging from 47% to 60% between 2009 and 2016. *Id.*

91.    Mastercard uses its market power to impose anticompetitive rules on the market for general purpose credit card transactions. For example, Mastercard's "honor all cards" rule requires that if an entity accepts any Mastercard credit cards, it must accept *all* Mastercard credit cards, regardless of the issuing bank or the interchange fee. Merchants faced with this all-or-nothing decision are forced to accept all Mastercard credit cards, despite Mastercard's unfavorable terms, which further entrenches Mastercard's market power.

92.    Mastercard also uses its market power to set default interchange fees for all credit card transactions. In economic terms, interchange fees fix the prices to be paid for transactions. Mastercard has continually raised the interchange fees that merchants must pay for accepting Mastercard credit cards. Mastercard does not set interchange fees based upon cost, as it would do in a competitive market.

93.    Thus, merchants pay supracompetitive fees to Mastercard. *See id.* at 110. But because Mastercard offers a must-have credit card, merchants do not have enough leverage to push back against its fee increases and negotiate a better deal. "Merchants would like to negotiate for lower interchange rates with Mastercard but are essentially 'forced' to accept the rates imposed by [Mastercard]." *Id.* at 99.

### iii.    Mastercard's Anticompetitive Scheme

94.    Mastercard's market power in the market for general purpose credit card transactions has allowed it to backstop the anticompetitive effects of the sham litigation against MarketDial by using anticompetitive bundling and *de facto* tying tactics to offer T&L at below-cost prices to customers.

95.    Mastercard accomplishes this scheme by offering some merchants "credit" that they "earn" by bringing credit card spending to Mastercard. This credit, which is sometimes

referred to as "Mastercard bucks," is typically offered to larger merchants who operate across many locations. The credit expires if it goes unused.

96.    Importantly, this credit can only be spent on a very limited range of products and services offered by the Mastercard Services business unit. T&L is among those few products and services. Other examples are SessionM, a platform for targeted promotions and loyalty programs, and Dynamic Yield, a platform for personalizing software experiences.

97.    At any given time, a merchant may not have any need of those products or services. Even if a merchant would consider purchasing a type of product or service that is offered under Mastercard Services, such as offline A/B testing software, the merchant would prefer the ability to select the company that offers the best product or service, or the product or service that is best suited to the merchant's needs. But a merchant may only make use of their Mastercard credit if they use one of the specific products or services associated with Mastercard Services, including T&L. Thus, while Mastercard credit has value for merchants who are purchasing T&L, it generally has limited value for those who are not purchasing T&L.

98.    Merchants who receive Mastercard credit are under enormous pressure to "purchase" T&L because their Mastercard credit otherwise has limited value. Merchants are aware that there are few other products and services that Mastercard credit can be spent on, and they usually have no interest or minimal interest in those products and services. Merchants are also aware that Mastercard credit expires if it goes unused—which it very often does. This anticompetitive scheme capitalizes on the fact that, for many merchants, Mastercard credit is worthless unless redeemed for a limited set of services, and they must use it or lose it by spending it on T&L.

99.     In economic terms, by allowing merchants to "purchase" T&L using Mastercard credit, Mastercard gives merchants a steep discount on T&L. After all, given the narrow constraints on using Mastercard credit, a dollar in Mastercard credit is less valuable to merchants than a dollar in cash value. The amount of the discount is often at or near the entire cost of APT's software. For that reason, MarketDial routinely hears from both prospective customers and current customers that they can obtain APT's software "for free" through Mastercard credit.

100.    Mastercard can afford to sell T&L at no cost to some merchants because of its supracompetitive profits in the market for general purpose credit card transactions. As noted, a federal court recently found that "Mastercard has enjoyed consistently high profit margins," and has noted evidence of Mastercard profit margins ranging from 47% to 60% between 2009 and 2016. *In re Payment Card*, 714 F. Supp. 3d at 99.

101.    Mastercard's scheme exploits its power over merchants in the market for general purpose credit card transactions, where it offers a must-have credit card, in order to prevent those same merchants from choosing the most suitable product in the market for offline A/B testing software. Even though MarketDial's software is of higher quality and priced more competitively than T&L, many merchants must weigh the fact that T&L is steeply discounted, often to the point of being effectively free. Thus, as an extension of Mastercard's exercise of market power in the market for credit card services, it blocks competition on the merits between MarketDial and APT. And because the largest merchants are most likely to receive Mastercard credit, Mastercard's scheme makes it especially difficult for MarketDial to compete on the merits for the largest potential customers.

102.    This is an anticompetitive and illegal bundling scheme. To begin with, it results in a discounted price that is below Defendants' incremental cost of producing the product. The only

economic value of Mastercard credit involves spending it on one among a narrowly defined range of products, including T&L. By allowing T&L to be purchased with Mastercard credit, Mastercard offers T&L at a steep discount. The discounted price is lower than the incremental cost of producing T&L. As a result, Mastercard's bundling scheme has the potential to exclude an equally efficient producer of a competitive product.

103.    Mastercard's bundling scheme is also anticompetitive because it is offered by a monopolist who conditions a bundled rebate on making purchases across multiple of its product lines, and thus forecloses the market to a potential competitor who does not manufacture an equally diverse group of products and cannot make a comparable offer. Mastercard both has market power over the market for general purpose credit card transactions and is a monopolist in the market for offline A/B testing software through its subsidiary, APT. Mastercard's bundled rebate—that is, the "purchase" of T&L through Mastercard credit—is only available when merchants both use Mastercard's credit card services and obtain T&L, or one of the few other Mastercard-affiliated products and services that are eligible to be obtained with Mastercard credit. This forecloses portions of the market to competitors, such as MarketDial, who solely offer offline A/B testing software and do not offer an equally diverse group of products, and therefore cannot make an offer comparable to Mastercard's.

104.    Mastercard's scheme is also a *de facto* anticompetitive tie between its credit card services and T&L. By steeply discounting T&L for merchants who obtain Mastercard credit by using its credit card services, to the point that T&L is effectively free for many of those merchants, Mastercard creates economic coercion for merchants seeking to obtain offline A/B testing software to obtain T&L rather than MarketDial. While it is theoretically possible to purchase APT software

separately from Mastercard's credit card services, it is unreasonably costly and difficult to do so for a merchant that has Mastercard credit.

## APT AND MASTERCARD'S ANTICOMPETITIVE CONDUCT HAS HARMED MARKETDIAL

105.    MarketDial has barely managed to survive the anticompetitive assault by APT and Mastercard. For most of MarketDial's existence, it has had to reallocate significant resources toward fighting off APT's sham litigation campaign rather than growing the company. At the same time, MarketDial has also had to contend with Mastercard using its power over credit card services to further entrench APT's monopoly through its anticompetitive bundling and *de facto* tying scheme.

106.    The entire point of the sham litigation was to drive MarketDial out of business. As the Court has observed, "APT litigated this case in an aggressive manner, incurring attorneys' fees beyond those justified in a normal intellectual property dispute." Sanction Order at 6. APT knew that it "had the resources to out-litigate MarketDial," especially considering its acquisition by Mastercard for $600 million in 2015. *Id.* at 10. This has had a direct effect on MarketDial's finances and its ability to grow. In 2024, MarketDial was forced to lay off 40% of its staff in order to cut costs.

107.    APT and Mastercard have also scared off many prospective investors wishing to avoid legal drama. The sham litigation has caused some existing investors to question their support and demand below-market terms for continuing their support. Other investors showed serious interest in acquiring MarketDial but ultimately backed away, and specifically cited the litigation as the key reason.

108.    The sham litigation has driven away many prospective customers as well. Some were deterred from entering into a relationship with a software vendor that was facing claims of

misappropriation of trade secrets, which appeared as if they could put MarketDial out of business. Some were also intimidated by the possibility of getting dragged into a legal battle with APT and Mastercard.

109. For example, a major company in the food and beverage industry had discussions with MarketDial about becoming a customer. But when APT notified that company about the sham litigation, that company decided to pause discussions with MarketDial until the sham litigation was resolved. As another example, a major retailer recently signed on as a MarketDial customer and revealed to MarketDial that it had waited a few years to sign as a result of the sham litigation.

110. Customers have also been coerced into purchasing T&L by Mastercard's anticompetitive bundling and *de facto* tying of Mastercard credit card services with T&L. Numerous prospective customers who prefer MarketDial's software continue to use T&L because they effectively receive it for free using Mastercard credit.

111. APT and Mastercard also affected MarketDial's employees. In some cases, potential talent that expressed interest in working at MarketDial ultimately sought employment at other companies. To many, taking a job at a startup that a monopolist is actively working to crush brings too much uncertainty. Meanwhile, MarketDial's leadership was distracted with years-long fighting with APT and Mastercard. This was especially true for Davis and Stoddard, who are individually named in the litigation.

112. Through their anticompetitive conduct, APT and Mastercard have disrupted MarketDial's growth trajectory. Based on highly conservative metrics, the compounding effect of APT's sham litigation alone has prevented MarketDial from increasing its revenue by tens of millions of dollars, and has lowered MarketDial's market value by hundreds of millions of dollars.

These estimates are eminently reasonable given that APT, with its inferior product, was sold for $600 million in 2015 (and has continued to grow since then).

113.    By artificially hampering MarketDial's ability to compete for business, APT and Mastercard have reduced choice and increased prices in the market. APT's own filings illustrate the harm its conduct has inflicted on competition. APT had to substantially reduce prices for customers, sometimes by over a third, as a result of competition from MarketDial. This price competition demonstrates that MarketDial's entry into the market was a significant win for customers of APT and MarketDial—and, conversely, that its inability to compete on the merits has been a significant loss for those customers, which survive on razor-thin margins and employ tens of millions of Americans.

## INTERSTATE COMMERCE

114.    APT and Mastercard's conduct has taken place in and affected the continuous flow of interstate trade and commerce in the United States, in that, *inter alia*:

  a.  APT and Mastercard's conduct has substantially affected the provision of offline A/B testing software—a product sold in interstate commerce—by excluding competitors in the market for such services;

  b.  APT and Mastercard have used instrumentalities of interstate commerce to provide offline A/B testing software; and

  c.  In furtherance of the anticompetitive conduct alleged herein, APT and Mastercard's employees have traveled between states and exchanged communications through interstate wire communications and via U.S. mail.

## CAUSES OF ACTION

### COUNT I
### SHERMAN ACT SECTION 2: MONOPOLIZATION (APT AND MASTERCARD)

115.    MarketDial repeats and realleges all paragraphs above as though fully set forth herein.

116.    APT maintains a monopoly over the market for offline A/B testing software.

117.    APT has monopoly power, *i.e.* the ability to control prices and output and exclude competition, in the market for offline A/B testing software, which is a relevant market in which the parties compete.

118.    APT and Mastercard have willfully acquired and maintained monopoly power in the market for offline A/B testing software by means of exclusionary and anticompetitive conduct, as alleged herein. This conduct includes but is not limited to sham litigation, anticompetitive bundling, and *de facto* tying.

119.    APT and Mastercard's conduct has no legitimate business purpose or procompetitive effect. Any non-pretextual business rationale for their conduct that APT or Mastercard attempts to claim could have been achieved through less restrictive means.

120.    APT and Mastercard's conduct has had a substantial effect on interstate commerce.

121.    MarketDial has suffered antitrust injury as a result of APT and Mastercard's anticompetitive conduct in the form of current and future lost profits, lost valuation, and artificially suppressed market share. APT and Mastercard's conduct has harmed competition overall in the market for offline A/B testing software.

122.    MarketDial has suffered substantial and calculable damages stemming from APT and Mastercard's anticompetitive conduct.

## COUNT II
## SHERMAN ACT SECTION 2: ATTEMPTED MONOPOLIZATION (APT AND MASTERCARD)

123.    MarketDial repeats and realleges all paragraphs above as though fully set forth herein.

124.    APT and Mastercard have attempted to, and have specifically intended to, monopolize the market for offline A/B testing software by means of exclusionary and anticompetitive conduct, as alleged herein. This conduct includes but is not limited to sham litigation, anticompetitive bundling, and *de facto* tying.

125.    There is a dangerous probability that APT will achieve monopoly power in the market for offline A/B testing software due to anticompetitive conduct by APT and Mastercard. Specifically, APT's high market share, in combination with the anticompetitive conduct described herein, creates a likelihood that APT will obtain the ability to control prices and output in the market for offline A/B testing software.

126.    APT and Mastercard's conduct has no legitimate business purpose or procompetitive effect. Any non-pretextual business rationale for their conduct that APT or Mastercard attempts to claim could have been achieved through less restrictive means.

127.    APT and Mastercard's conduct has had a substantial effect on interstate commerce.

128.    MarketDial has suffered antitrust injury as a result of APT and Mastercard's anticompetitive conduct in the form of current and future lost profits, lost valuation, and artificially suppressed market share. APT and Mastercard's conduct has harmed competition overall in the market for offline A/B testing software.

129.    MarketDial has suffered substantial and calculable damages stemming from APT and Mastercard's anticompetitive conduct.

## COUNT III
## WRONGFUL USE OF CIVIL PROCEEDINGS (APT AND MASTERCARD)

130.    MarketDial repeats and realleges all paragraphs above as though fully set forth herein.

131.    APT, with the direction and support of Mastercard, brought civil proceedings against MarketDial for a purpose other than that of securing the proper adjudication of the claims on which the proceedings were based. The purpose of APT and Mastercard's litigation was to preserve APT's monopoly and put MarketDial, an upstart competitor, out of business.

132.    APT and Mastercard knew that APT's purported trade secrets did not exist and that no APT trade secrets had been misappropriated by MarketDial. APT and Mastercard did not reasonably believe that there were facts upon which their trade secrets allegations against MarketDial could be based, nor that those allegations may be valid under the applicable law.

133.    Those wrongful proceedings have now terminated in MarketDial's favor. As the Court has recognized, MarketDial is the "prevailing party" in that litigation, having "won completely on every claim at issue." Sanction Order at 3 (citation omitted).

134.    MarketDial has suffered substantial and calculable damages stemming from APT and Mastercard's wrongful and abusive litigation.

## COUNT IV
## ABUSE OF PROCESS (APT AND MASTERCARD)

135.    MarketDial repeats and realleges all paragraphs above as though fully set forth herein.

136.    APT, with the direction and support of Mastercard, brought a lawsuit against MarketDial for the ulterior purpose of preserving APT's monopoly and putting MarketDial, an upstart competitor, out of business.

137. APT and Mastercard knew that APT's purported trade secrets did not exist and that no APT trade secrets had been misappropriated by MarketDial. APT and Mastercard did not reasonably believe that there was any basis for the claims against MarketDial under the relevant facts or the applicable law.

138. The improper purpose of APT and Mastercard's litigation against MarketDial is corroborated by multiple other acts, including but not limited to their efforts to disparage MarketDial to prospective customers and investors, intimidate prospective MarketDial customers, and monopolize the market through anticompetitive bundling and *de facto* tying with other Mastercard services.

139. MarketDial has suffered substantial and calculable damages stemming from APT and Mastercard's wrongful and abusive litigation.

## COUNT V
## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS (APT AND MASTERCARD)

140. MarketDial repeats and realleges all paragraphs above as though fully set forth herein.

141. APT and Mastercard intentionally interfered with MarketDial's actual and prospective economic relationships, including but not limited to relationships with actual or prospective customers, actual or prospective investors, and prospective employees.

142. APT and Mastercard interfered with these relationships through improper means. This includes their baseless and abusive litigation against MarketDial, disparagement of and false statements about MarketDial, intimidation of actual and prospective MarketDial customers, and the other improper and anticompetitive conduct described herein.

143.    MarketDial has suffered substantial and calculable damages stemming from APT and Mastercard's intentional interference with actual and prospective economic relations.

**PRAYER FOR RELIEF**

144.    WHEREFORE, Plaintiff MarketDial prays for judgment against Defendants as follows:

A.    Adjudication that the acts alleged herein constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

B.    Adjudication that the acts alleged herein constitute attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

C.    Adjudication that the acts alleged herein constitute wrongful use of civil proceedings;

D.    Adjudication that the acts alleged herein constitute abuse of process;

E.    Adjudication that the acts alleged herein constitute tortious interference with economic relations;

F.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

G.    Equitable relief in the form of enjoining Defendants from engaging in the anticompetitive conduct alleged herein;

H.    Equitable relief as may be required to restore competition and to prevent the recurrence of future antitrust violations alleged herein;

I.    The costs of bringing this suit, including reasonable attorneys' fees; and

J.    All other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

145.    Pursuant to Federal Rule of Civil Procedure 38(b), MarketDial demands a jury trial as to all issues triable by a jury.

Dated:  February 26, 2026                    Respectfully Submitted,

*/s/ Stephen Wood*

Adam B. Wolfson (*pro hac vice* forthcoming)
William R. Sears (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
adamwolfson@quinnemanuel.com
willsears@quinnemanuel.com

Stephen Wood
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 520
Salt Lake City, Utah 84121
(801) 515-7300
stephenwood@quinnemanuel.com

Andrew Faisman (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
(212) 849-7000
andrewfaisman@quinnemanuel.com

*Attorneys for Plaintiff MarketDial, Inc.*